OSOWIK, J.
{¶ 1} Appellant, Jerry Wray, Director of the Ohio Department of Transportation ("ODOT"), appeals the April 28, 2016 judgment of the Erie County Court of Common Pleas dismissing a petition for appropriation of property belonging to appellee, Speedway LLC. For the following reasons, we reverse.
I. Background and Facts
{¶ 2} Speedway owns a gas station and convenience store located on a parcel of land adjacent to the intersection of U.S. Route 250 and State Route 2 in Erie County. The property has two driveways (the "north drive" and the "south drive") to *1040 accommodate Speedway's patrons. The north drive is nearer the Route 250/Route 2 interchange and is the subject of the underlying appropriation action that ODOT filed on October 1, 2014.
{¶ 3} In the petition, ODOT sought to appropriate .1937 acres of Speedway's property. The petition sought a "WL" taking, which is the appropriation of a fee simple interest in the property along with the right to limit the property owner's access to the abutting highway. The petition also sought a temporary construction easement over .0685 acres of land. ODOT deposited $5,950 with the clerk of courts at the time it filed the petition. Speedway filed its answer on November 3, 2014. In it, Speedway admitted that ODOT intended to use the land subject to the WL taking "for the purposes of making, constructing, repairing or improving a state, U.S. or interstate highway which shall be open to the public, without charge" and did not assert any statutory challenges to the appropriation. On January 13, 2016, Speedway filed a motion for leave to file an amended answer on the basis that it had recently learned from its engineering expert that the taking was not necessary. The trial court granted the motion on March 8, 2016, over ODOT's objection. Speedway's amended answer denied both ODOT's claimed purpose and the necessity of the appropriation.
{¶ 4} On April 14, 2016, the trial court held a combined hearing on the issues of whether the taking was for the purpose of making or repairing free public roads and, if not, whether the taking was necessary. ODOT objected to the combined hearing, arguing that the court should determine the issue of purpose before hearing evidence on necessity. The court overruled the objection and proceeded with the hearing. ODOT also objected throughout the hearing that the bulk of Speedway's evidence was related to damages to the residue, not purpose or necessity. The court overruled the objections.
{¶ 5} For its case in chief, Speedway called Robert Matko, an engineering manager for CESO, Inc., an engineering and architectural firm. He is responsible for quality control of all Speedway sites. Speedway hired CESO and Mr. Matko to "evaluate the operational impacts of a proposed ODOT roadway project on the existing Speedway store * * *." Mr. Matko prepared a report based on two alternatives: closing the north drive and making the north drive a right-turn only exit drive. Mr. Matko conducted a traffic study to gather data for the report. His analysis included examinations of stacking, queuing, capacity, and fuel truck movement within the Speedway parking lot. Notably, the study focused almost exclusively on the impact to traffic within Speedway's parking lot, not the impact to traffic on Route 250.
{¶ 6} Stacking refers to the number of cars lined up to enter or exit and is related to queuing, which refers to the length of the line of cars waiting to enter or exit. Mr. Matko found that the right-turn only option would provide less stacking and prevent the exiting queue from blocking a gas pump and impeding internal traffic in Speedway's parking lot.
{¶ 7} Capacity refers to the delay between each vehicle that enters or exits the property. Capacity analysis results are quantified with a letter grade from A to F. Mr. Matko gave both alternatives similar grades, ranging from A to D. He opined that increased delay can decrease safety on Route 250 because drivers are willing to enter or exit the property through smaller gaps in traffic.
{¶ 8} As to internal fuel truck traffic flow, Mr. Matko concluded that either change to the north drive would require *1041 fuel trucks to drive between the convenience store and the fuel pumps to reach the underground fuel storage tanks in the correct orientation for depositing fuel, rather than following the current practice of driving in the north drive and out the south drive, which keeps the trucks along the edge of the property closest to Route 250 and parallel to the fuel pumps. He described this as dangerous because fuel trucks would be required to drive through an area with more pedestrian traffic than the current route. He opined that closing the north drive and keeping the south drive at its current width would also cause safety issues on Route 250 because fuel trucks could entirely block the drive as they exit.
{¶ 9} The narrative summary included with the CESO report discusses four driveway configurations for possible use on the site. The summary classifies the options in order of their impact on the Speedway site, from lowest to highest, and states preference for the options in the following order: (1) keeping both drives fully open, (2) making the north drive a right-turn only drive and widening the south drive, (3) closing the north drive and widening the south drive, and (4) closing the north drive without widening the south drive. The summary also notes that closing the north drive and widening the south drive is the minimum amount of access needed for the site to operate safely. At the hearing, however, Mr. Matko testified that he did not write or review the narrative summary and that he did not agree that closing the north drive was a viable alternative. Rather, he referred to his conclusions at the end of the study and testified that he believes that making the north drive right-turn only is the safer of the two driveway alterations that he examined. The report's conclusion states only that the right-turn only option is the preferred alternative for Speedway's operations because it provides the best internal circulation, shortens the length of queues, and reduces the number of cars that are stacked.
{¶ 10} On cross, Mr. Matko agreed that the video of the traffic counts he analyzed showed a semi having difficulty turning out of the south drive. He later pointed out that other vehicles had used the north drive while the semi was blocking the south drive, which is why he believes making the north drive right-turn only is imperative. He agreed that the traffic count video showed queuing and stacking happening simultaneously at the north drive and the south drive. He also agreed that driveways create conflict points on the roadway, that fewer conflict points makes travel on the road safer, and that one of the goals of access management is to minimize conflict points. He conceded that widening the eastbound Route 2 onramp is one of the main goals of the proposed alterations at Speedway's location.
{¶ 11} Speedway's next witness was Timothy Lowe, a senior project manager at CESO who manages the roadway design group. He testified to an alternate ramp design he developed that would not require the closing of the north drive. While ODOT's design widens the existing ramp's entrance, the new design requires that the entire onramp be moved and reconstructed. The alternate ramp proposes a 70-degree skew at the intersection, as opposed to the 89-degree skew in ODOT's plans that leaves the roads virtually perpendicular. Mr. Lowe's design does not accommodate through movement, a maneuver that allows a driver who mistakenly exits onto Route 250 to proceed straight through the intersection to the Route 2 onramp. But he provided a modification to his design that he believes would accommodate through traffic. The through movement modification requires traffic to jog to *1042 the left to reenter Route 2 instead of driving straight through the intersection. He opined that his ramp design and ODOT's ramp design are equally acceptable from an engineering standpoint. He also testified that the new design would cost approximately $750,000 to $1 million more than ODOT's design.
{¶ 12} On cross, Mr. Lowe testified that he was not approached by Speedway's counsel to investigate and develop an alternative design until February of 2016. He admitted that he only considered Speedway's specific location-not the entire Route 250 corridor-when he created his design and that changes in a specific portion of the road can affect the entire corridor. Based on his involvement in the project, though, he did not believe that altering the onramp in this case would affect the whole corridor. He agreed that ODOT's ramp design is logical. He also believes that his design accomplishes both ODOT's goal of expanding the turning radius for semi traffic and Speedway's goal of minimizing impact on its operations. Mr. Lowe did not do a full design or safety study of the proposed ramp; the extent of his involvement was providing an alternative that meets the geometric and regulatory guidelines for a workable onramp.
{¶ 13} Speedway's final witness was Steven Rice, a division project manager for Speedway. His testimony mainly related to how ODOT's project on Route 250 would affect that particular Speedway location and largely echoed Mr. Matko's testimony regarding traffic and fuel truck flow through Speedway's parking lot. On cross, Mr. Rice testified that he believed that closing the north drive would cause safety problems on Route 250 because it would be more difficult for vehicles to leave Speedway's property. He also agreed, however, that the video from the traffic study showed examples of safety issues even with both drives open. He also testified that he does not receive information about any accidents that happen at a Speedway location unless a Speedway employee is involved.
{¶ 14} Julie Cichello, the district traffic engineer for ODOT District 3, was ODOT's only witness. Ms. Cichello testified about the plans ODOT created for the Route 250 corridor project and filed with the Erie County engineer. Ms. Cichello testified that ODOT commissioned a safety study in 2003 to investigate the Route 250 corridor because it is historically a high-crash roadway. Most accidents occur at intersections and driveways, mainly due to traffic congestion. The accidents continued despite ODOT implementing remedial measures such as modified signal timing and new signage. The study involved forming a steering committee composed of owners of businesses along the Route 250 corridor, government officials, and emergency services personnel to help identify problems with the corridor, form goals for the study, and provide feedback on ODOT's conceptual designs. ODOT invited everyone along the corridor to join the steering committee. Additionally, ODOT held public meetings and received public comments as part of the study. To inform property owners about the steering committee and public meetings, Ms. Cichello explained that ODOT delivers a letter to the property and mails a letter to the titled owner. Speedway did not participate in the study activities.
{¶ 15} The safety study that was admitted into evidence shows that six design alternatives were created for the Route 250 corridor. Ms. Cichello said that access management is an important part of each design because it reduces conflict points along the corridor and, consequently, increases road safety. In her opinion, access management is part of repairing and constructing *1043 a highway because it is one of the many components required for projects like the one at issue. The study ultimately resulted in the designs for project ERI-250-0.00, a comprehensive improvement project for the Route 250 corridor from U.S. Route 6 to Bogart Road in Erie County. ODOT held additional public meetings while it was developing the actual plans for the project so that the public could see the proposed construction and any impact it would have on properties along the corridor. Speedway did not participate in these meetings, either.
{¶ 16} According to Ms. Cichello, the portion of the project for which ODOT seeks to appropriate Speedway's land involves modifications to the eastbound onramp from Route 250 to Route 2 (referred to in the plans as "Ramp 'C' "). The project description states that
[t]his project includes improving US 250 (Milan Road) by upgrading the existing traffic signals and signing, incorporating access management, and adding turn lanes where needed. * * * Additional lanes on the SR 2 interchange ramps will be added. Sideroad [sic] improvements include * * * Ramp [ ] * * * "C" * * *.
The project calls for converting an existing highway easement ODOT has on the property into a fee simple ownership interest, blocking access to the north drive by placing a curb, and widening the eastbound onramp to Route 2 to accommodate semi-trucks turning right from Route 250 to Route 2. Ms. Cichello explained that the ramp in its current configuration is not wide enough for semis to enter without driving over an existing curb. There is also a sign at the intersection that is "continuously" hit by semi-trucks.
{¶ 17} The ramp in ODOT's plans begins in front of the north drive and essentially places the north drive in the intersection of Route 250 and Route 2. Under the specifications of ODOT's Location and Design Manual, a driveway that serves all directions of traffic (such as the north drive) should be at least 600 feet from a major intersection (such as the Route 250/Route 2 interchange). Ms. Cichello testified that this specification is discretionary, not mandatory. Both of Speedway's drives are within 600 feet of the intersection, but ODOT's construction plans do not seek to close both; rather, ODOT seeks to close the north drive, which is closer to the intersection, and leave the south drive available for ingress and egress. Ms. Cichello stated that ODOT would not seek to close the north drive if it were the only access point for Speedway's property, but would move the drive as far from the intersection as possible.
{¶ 18} Ms. Cichello indicated that the project calls for WL takes in all four quadrants of the Route 250/Route 2 intersection. ODOT wants to limit access in those locations to maintain the safety and efficiency of the interchange by reducing conflict points and congestion near the intersection. Ms. Cichello disagreed with Speedway's claim that closing the north drive would cause more safety issues on Route 250. She believed that reducing the number of conflict points on the highway increases safety and that driveways close to intersections tend to cause safety problems. She also believed that, from an engineering standpoint, fuel trucks could safely enter Speedway's site with only one drive if the south drive is widened to 50 feet.
{¶ 19} Regarding CESO's ramp design, Ms. Cichello criticized the fact that it goes beyond ODOT's plans for the project by reconstructing the onramp rather than widening the onramp's radius, does not allow for the through movement ODOT's plans permit, and does not include a horizontal curve that can accommodate a semi-truck *1044 traveling at 40 miles per hour or more. She noted that even though a 70-degree skew at an intersection is an acceptable design, a 90-degree skew is preferred for the flow of traffic in through lanes and easier turns. She took issue with these perceived design flaws because they could lead to accidents in the intersection or on the ramp. Ms. Cichello further testified that the onramp to Route 2 is operational and not in need of reconstruction or repair beyond widening the turning radius. She also explained that using the CESO design would require ODOT to conduct another interchange modification study, which needs state and federal approval and costs additional money. She did not believe, however, that the CESO design would require a complete redesign of the whole interchange.
{¶ 20} On cross, Ms. Cichello testified that the taking ODOT seeks includes a purchase of access rights, which would prevent anyone from accessing Route 250 from that location. She was unaware of any accidents that occurred at the north drive, though she testified that accidents occurring so close to an intersection are often reported as intersection-related. She confirmed that ODOT does not necessarily study each individual driveway in connection with an access management project, but looks at the corridor as a whole. She also admitted that ODOT did not conduct any traffic engineering studies specifically at Speedway's location.
{¶ 21} Ms. Cichello further confirmed that ODOT has some discretion regarding the specifications in the Location and Design Manual, which it exercised in this case when it chose to close the north drive as part of the project. She classified the taking as an access management taking. She admitted that ODOT was not proposing to construct a new road at the north drive, or relocate or widen Route 250 at the north drive. She also admitted that ODOT's existing easement allows it to resurface and improve drainage at the Speedway site.
{¶ 22} As to the findings in the CESO report, Ms. Cichello generally agreed with them, but criticized Mr. Matko's failure to take the signalized intersection into account in his queuing and capacity analyses. She also stated that the study included similar and acceptable levels of service both when the north drive is closed and when it is right-turn only. She conceded that the alternative ramp design suggested by CESO meets all applicable roadway design guidelines. She expressed concerns about through movement on the alternate ramp, but conceded that the design could likely be modified. Ms. Cichello maintained throughout that both the driving public and Speedway customers would be safer with the north drive closed.
{¶ 23} On April 28, 2016, the trial court issued its decision finding that the appropriation at the Speedway property is not "for the purposes of making, constructing, repairing or improving a state, U.S. or interstate highway which shall be open to the public, without charge * * *" because ODOT is not widening, adding turn lanes to, or relocating Route 250 at Speedway's property and adding a sidewalk does not turn the project into one for making or repairing a road. The court further found that the appropriation is not necessary because ODOT failed to consider equally acceptable alternate designs and that increased costs alone do not create necessity. Consequently, the trial court dismissed ODOT's petition with prejudice and ordered that ODOT refrain from taking any other action to limit access to Speedway's property.
{¶ 24} ODOT appeals the trial court's dismissal of its petition for appropriation, raising three assignments of error:
*1045 PLAINTIFF-APPELLANT'S FIRST ASSIGNMENT OF ERROR:
The trial court erred in deciding that ODOT's appropriation of Speedway's property was not for the purpose of making or repairing a free public road.
PLAINTIFF-APPELLANT'S SECOND ASSIGNMENT OF ERROR:
The trial court erred in deciding that ODOT's appropriation of Speedway's property was not necessary.
PLAINTIFF-APPELLANT'S THIRD ASSIGNMENT OF ERROR:
The trial court erred by ordering ODOT to take no action to limit access to the Speedway property even after the appropriation was dismissed.
II. Law and Analysis
A. Appropriations Law
{¶ 25} Under Article I, Section 19, of the Ohio Constitution, "Private property shall ever be held inviolate, but subservient to the public welfare." The legislature has the power to enact "a specific and reasonable method and limitation for the exercise of a right conferred in general terms by the Constitution." State ex rel. McLeary v. Hilty , 139 Ohio St. 39, 43, 38 N.E.2d 198 (1941). It has done so regarding appropriation procedures in R.C. Chapter 163. The director of ODOT has the power to appropriate land for public purposes. R.C. 163.02(B). Generally, a public agency seeking to exercise eminent domain power cannot take possession of the land before the owner is paid just compensation as determined by a jury. Ohio Constitution, Article I, Section 19 ; Cassady v. Columbus , 31 Ohio App.2d 100, 103, 286 N.E.2d 318 (10th Dist.1972). Even so, a public agency may use "quick take" procedures to take immediate possession of property when it files a petition for appropriation if it simultaneously deposits with the court the amount of money that the agency determines will compensate the owner for the taking and any damage to the residue. R.C. 163.06(A), (B). The landowner is entitled to file an answer to the petition, but if the appropriation is made "for the purpose of making or repairing roads, which shall be open to the public, without charge * * *" the owner may not deny the agency's right to make the appropriation, the necessity of the appropriation, or the parties' inability to agree. R.C. 163.08.
{¶ 26} If the appropriation petition "contains a declaration and journalization of [ODOT's] intent to construct a state highway or interstate highway, [the petition] shall constitute a presumption that such appropriation is for the purpose of making or repairing roads * * *." Id. When purpose is disputed the trial court may hold a hearing on the issue. At a hearing on the issue of purpose, "a set of construction plans made by or for the director and showing the proposed use of the property in connection with the construction or repair of such a road is presumptive evidence of such purpose * * *."Id.
B. Standard of Review
{¶ 27} The parties dispute the correct standard of review for the trial court's determination of purpose. ODOT contends that we should review the trial court's decision de novo because it involved the interpretation of the statutory phrase "for the purpose of making or repairing roads which shall be open to the public, without charge * * *." Speedway, on the other hand, argues that we should apply a manifest weight of the evidence standard because we are reviewing the trial court's factual determinations.
{¶ 28} We believe that ascertaining ODOT's purpose presents a mixed question of law and fact. As such, the trial court's interpretation of the language in *1046 R.C. Chapter 163 and its application of the law to the facts are purely legal issues that we review de novo. State v. Pariag , 137 Ohio St.3d 81, 2013-Ohio-4010, 998 N.E.2d 401, ¶ 9 ; Barcosh, Ltd. v. Dumas , 6th Dist. Lucas No. L-10-1001, 2010-Ohio-3066, 2010 WL 2638516, ¶ 14. We review the court's findings of fact under a manifest weight of the evidence standard. Barcosh at ¶ 14 ; see Eastley v. Volkman , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, 19.
C. First Assignment of Error
{¶ 29} ODOT argues in its first assignment of error that the trial court erred by finding that ODOT was not making or repairing a free public road at Speedway's property and, therefore, could not use quick take procedures to appropriate the property. ODOT contends that the trial court should have deferred to ODOT's statement of purpose absent ODOT abusing its discretion, that limiting access is making or repairing a road, that a road includes the area where ODOT intends to place a sidewalk, and that ODOT's project constitutes making or repairing a road even under the trial court's narrow definition. Speedway counters that the trial court properly evaluated ODOT's statement of purpose and made factual findings that Speedway overcame the statutory presumption in favor of ODOT.
{¶ 30} As the trial court noted, the terms "making" and "repairing" are not defined in R.C. Chapter 163. The court stated:
30. Here, Merriam-Webster Dictionary defines "making" as, inter alia, "the act or process of forming, causing, doing, or coming into being," and defines "make" as, inter alia, "to lay out and construct < make a road>." Similarly, Dictionary.com defines "making" and "make" as, inter alia, "to bring into existence by shaping or changing material, combining parts, etc."
31. Merriam-Webster Dictionary also defines "repair" as, inter alia, "to restore by replacing a part or putting together what is torn or broken." Similarly, Dictionary.com defines "repair" as, inter alia, "to restore to a good or sound condition after decay or damage; mend."
Using these definitions, the trial court narrowly construed "making or repairing" to mean "widening, adding turn lanes to, or relocating" because it found that "making or repairing" cannot be read so broadly as to encompass any appropriation ODOT seeks. It specifically found that "ODOT will not be widening, adding turn lanes to, or relocating U.S. 250 at Speedway's property." (Emphasis added.)
{¶ 31} While we agree with the trial court's conclusion that "making or repairing" cannot be interpreted to cover every project ODOT undertakes, we doubt that the phrase "making or repairing" should be read as narrowly as "widening, adding turn lanes to, or relocating." The scope of the definition is unimportant here, however, because ODOT's appropriation of Speedway's property is for the purpose of making or repairing free public roads even under the trial court's definition. Specifically, the trial court's findings of fact ignore that ODOT is, in fact, widening a portion of the eastbound Route 2 onramp-albeit a small portion-on a part of Speedway's property.
{¶ 32} As discussed above, we review the trial court's factual findings under a manifest weight of the evidence standard, but review the trial court's application of the law to the facts de novo. Barcosh , 6th Dist. Lucas No. L-10-1001, 2010-Ohio-3066, 2010 WL 2638516, at ¶ 14. A challenge to the manifest weight of the evidence questions whether the prevailing party met its burden of persuasion.
*1047 Eastley , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, at ¶ 19. In reviewing a manifest weight challenge we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id. at ¶ 20, citing State v. Thompkins , 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In undertaking this analysis, we give deference to the findings of the trial court because the trial judge is in the best positions to view the witnesses and observe their demeanor, gestures, and voice inflections. Brown v. Lagrange Dev. Corp. , 6th Dist. Lucas No. L-09-1099, 2015-Ohio-133, 2015 WL 223877, ¶ 24, citing Seasons Coal Co. v. Cleveland , 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).
{¶ 33} Here, the trial court concluded that ODOT's purpose was limiting Speedway's access to Route 250, not making or repairing Route 250. It based that conclusion on several facts. First, the trial court relied heavily on the fact that ODOT sought a WL take (a taking in fee simple with limitation of access) as opposed to a WD take (a taking in fee simple by warranty deed). Second, the court concluded that the title sheet of the construction plans supported its finding because the project description states that the project includes upgrading existing traffic signals and signing, incorporating access management, and adding turn lanes. Finally, the court determined that the road improvements ODOT proposed in the area of the north drive (resurfacing and drainage improvement) are within the scope of ODOT's existing easement on the property, but limiting access is not. For these reasons, the trial court found that ODOT's purpose for the project is limiting Speedway's access to Route 250, not making or repairing Route 250. Notably, the trial court only made that conclusion as to Route 250; it did not address whether ODOT is widening, adding turn lanes to, or relocating the onramp.
{¶ 34} The trial court's conclusion in relation to purpose ignores a critical fact that is indisputably supported by the record: the widening of the eastbound Route 2 onramp happens, in part, on Speedway's property. This is most readily seen in ODOT's construction plans, which show that the ramp begins to widen near the middle of the north drive. It is also supported by testimony from both parties' witnesses that the onramp taper begins on Speedway's property. Additionally, the testimony confirms that the end result of ODOT's project will be a wider onramp to Route 2 that begins widening on what is currently Speedway's property. The title sheet of the construction plans further supports a finding that ODOT's purpose is making or repairing a road because it notes that the project includes side road improvements to "Ramp 'C'," which contemplates changes to the eastbound onramp. The trial court's findings to the contrary are against the manifest weight of the evidence.
{¶ 35} Based on the evidence in the record, we conclude that ODOT intends to widen the eastbound Route 2 onramp on the property it seeks to appropriate from Speedway. We have little doubt that a highway onramp is within the ordinary meaning of the word "road." Even if it is not, a "road" includes "all appurtenances" to the road including but not limited to "approaches on or to" the road. R.C. 5501.01(C). An onramp qualifies as both an appurtenance and an approach to a highway. Thus, using the trial court's interpretation of "making or repairing" leads to the conclusion that ODOT's purpose for appropriating Speedway's property is making or repairing a road.
*1048 {¶ 36} While limiting Speedway's access to Route 250 is undoubtedly part of ODOT's purpose, it is not the sole purpose for the project. Ms. Cichello testified that ODOT wants to both limit access near the Route 250/Route 2 intersection and widen the eastbound Route 2 onramp to accommodate semi-trucks. Mr. Matko-whose testimony the trial court found more credible than Ms. Cichello's testimony-even admitted that he believed that one of ODOT's primary goals is accommodating semi-truck traffic and that the proposed closing of the north drive accomplishes that goal. We could find no authority to support the proposition that making or repairing a road must be the only purpose for an appropriation. Accordingly, we find that the closure of the north drive is "for the purpose of making or repairing roads which shall be open to the public, without charge * * *" and that the trial court erred in determining that ODOT's appropriation of Speedway's property is outside the scope of R.C. 163.06(B). ODOT's first assignment of error is, therefore, well-taken.
D. Second and Third Assignments of Error
{¶ 37} In its second and third assignments of error, ODOT argues that the trial court erred by finding that the appropriation of Speedway's property is not necessary and by limiting ODOT's ability to limit access to the north drive after the petition for appropriation was dismissed.
{¶ 38} Under R.C. 163.08, a landowner may not challenge the necessity of an appropriation when the appropriation is "for the purpose of making or repairing roads, which shall be open to the public, without charge * * *." Because we find that ODOT's purpose is making or repairing free public roads, we further find that the trial court erred by allowing Speedway to challenge the necessity of ODOT's appropriation of the north drive. As the lack of necessity was the basis for the trial court dismissing the petition and ordering that ODOT take no other action to limit Speedway's access to the property, we also find that those decisions are in error. Thus, ODOT's second and third assignments of error are well-taken.
III. Conclusion
{¶ 39} The April 28, 2016 judgment of the Erie County Court of Common Pleas is reversed and the cause is remanded for further proceedings consistent with this opinion. Speedway is ordered to pay the costs of this appeal pursuant to App.R. 24.
Judgment reversed.
Mark L. Pietrykowski, J.
Arlene Singer, J.
CONCUR.